```
                                          FILED
                                  CLERK, U.S. DISTRICT COURT

                                       APR - 8 2003

                                  CENTRAL DISTRICT OF CALIFORNIA
                                  BY                    DEPUTY
```

Priority    X
Send        X
Enter       ___
Closed      ___
JS-5/JS-6   ___
JS-2/JS-3   ___
Scan Only   ___

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAMEDA CORRIDOR TRANSPORTATION AUTHORITY; CITY OF LOS ANGELES, a municipal corporation; and CITY OF LONG BEACH, a municipal corporation,<br><br>Plaintiffs,<br><br>v.<br><br>STEWART TITLE GUARANTY COMPANY, a Texas corporation,<br><br>Defendant. | No. CV 01-04688 PA (MANx)<br><br>ORDER GRANTING STEWART TITLE GUARANTY COMPANY'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT |

ENTER ON ICMS

APR - 8 2003

Plaintiff Alameda Corridor Transportation Authority ("ACTA") is a joint powers authority created in 1989 by the Cities of Los Angeles and Long Beach. ACTA developed and constructed the "Alameda Corridor," a program of infrastructure improvements designed to facilitate transportation between the ports of Long Beach and Los Angeles and the central Los Angeles area. As part of the project, the Cities of Los Angeles and Long Beach purchased the right of way of the Southern Pacific Railroad's San Pedro Branch (the "Right of Way"). In conjunction with that purchase, Stewart Title Guaranty Company ("Stewart Title") issued a policy of title insurance on December 29, 1994 (the "Policy"),

142

Stewart Title filed a Motion for Judgment on the Pleadings on December 7, 2001. That motion was based only on Exclusion 3 for easements not shown by the public records. Plaintiffs opposed that motion and argued that the Policy's Special Endorsement provided coverage. In a Minute Order dated February 28, 2002, United States District Judge Christina A. Snyder denied Stewart Title's motion because the novel issues of law raised by the parties were not appropriate for resolution at that early stage of the litigation. Now, with the benefit of additional discovery and a well-developed factual record, the parties have submitted cross motions for summary judgment raising the statute of limitations, Exclusions 3, 9(a), and 9(c), and the Special Endorsement.

## I. FACTUAL BACKGROUND

Plaintiffs contend that Stewart Title failed to disclose the existence of a sanitary sewer easement (the "Sewer Easement") which runs underneath the Right of Way at the intersection of Alameda and 37th Streets in the City of Vernon. The Sewer Easement, which runs in favor of the City of Los Angeles, resulted from a condemnation suit initiated by the City of Los Angeles. On January 24, 1934, the City of Los Angeles obtained a final judgment creating the Sewer Easement which was recorded in the Official Records of the County of Los Angeles as Document No. 879-31 in Book 12538, Pages 186-188 (the "Final Judgment"). The Final Judgment is captioned: "The City of Los Angeles, a municipal corporation, Plaintiff, vs. Atchison, Topeka and Santa Fe Railway Company, a corporation, formerly California Central Railway Company, a corporation, et al." Southern Pacific is mentioned in the body of the Final Judgment as a grantor but not in the caption. The Los Angeles County Recorder's Office did not index the Final Judgment under Southern Pacific's name in the Grantor's Index. Earlier, however, the City of Los Angeles had recorded a lis pendens of the lawsuit on July 18, 1932 in Book 11662, page 288 of the Official Records of the County of Los Angeles (the "Lis Pendens"). The Lis Pendens is indexed in the Los Angeles County Recorder's Grantor Index under "Southern Pacific Railroad Company."

The Sewer Easement was depicted on certain "val maps" which Plaintiffs reviewed before purchasing the Right of Way from Southern Pacific. Stewart Title also reviewed the val maps and conducted a title plant search prior to issuing the Policy. A title plant search examines the title company's accumulated previously issued preliminary reports, guaranties, title policies, and a collection of photocopies or abstracts of all documents recorded in the area served by the title company. See Title Insurance Practice, Records Examined by Title Companies – The Title Company Plant § 4.10 (Cont. Ed. Bar 2nd ed. 1997). Stewart Title did not review the County Recorder's Grantor Index prior to issuing the Policy and failed to locate the Sewer Easement. ACTA eventually paid in excess of $7 million to relocate the sewer line beneath the Alameda Corridor's Mid-Corridor Trench.

The Policy provided title insurance coverage for the Right of Way of up to $235 million for "[a]ny defect in or lien or encumbrance on . . . title" subject to the "conditions and stipulations" of the Policy and the exclusions to coverage set forth in Schedule B, Part I of the Policy.[1/] The parties agree that only exclusions 3, 9(a), and 9(c) of the Schedule B general exclusions are potentially relevant here. Specifically, the potentially relevant exclusions preclude coverage for:

> 3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.[2/]
>
> * * *
>
> 9. Defects, liens, encumbrances, adverse claims, or other matters (a) whether or not shown by the public records at Date of Policy, but created, caused, suffered, assumed or

---

[1/] In addition to the preprinted exclusions, Schedule B lists 317 known encumbrances on the Right of Way.

[2/] The Policy defines "public records" as "those records which by law impart constructive notice of matters relating to the land."

> agreed to by the insured claimant;[3] . . . [or] (c) resulting in no loss or damage to the insured claimant . . . .

The Policy also contained a "Special Endorsement" by which Stewart Title:

> [H]ereby insures the Insured that the easement estates or easement interests as shown in Schedule A of this policy include the right to construct, install, erect, reconstruct, locate, maintain, use and operate rail and rail-related appurtenances on and under the surface (without limitation as to depth) of the easement estates or easement interest described in Schedule A.

The Special Endorsement resulted from negotiations between Stewart Title and Plaintiffs arising out of Plaintiffs' concerns that because the Right of Way being purchased from Southern Pacific was in most areas an easement rather than a fee, Plaintiffs would not have the right to dig the Mid-Corridor Trench contemplated by the design of the Alameda Corridor.

Plaintiffs submitted a claim to Stewart Title in January 2000 seeking reimbursement for the sewer relocation costs. Plaintiffs claim that they did not become aware of the Sewer Easement until late 1999. Stewart Title contends that because the Sewer Easement runs in favor of the City of Los Angeles and was depicted on the val maps, Plaintiffs should be charged with knowledge of the Sewer Easement as of the date the policy was issued on December 29, 1994 or, at a minimum, no later than June 5, 1997 when an ACTA

---

[3] The Policy defines "insured claimant" as "an insured claiming loss or damage hereunder." The Policy defines "insured" as "the insured named in Schedule A, and, subject to any rights or defenses the Company may have had against the named insured, those who succeed to the interest of such insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors." Schedule A lists the named insured as "City of Los Angeles, a municipal corporation, acting by and through its Board of Harbor Commissioners and City of Long Beach, a municipal corporation, acting by and through its Board of Harbor Commissioners."

-4-

memorandum indicates that engineers from ACTA and the City of Los Angeles discussed the relocation of the sewer line. Plaintiffs filed suit on April 25, 2001.

## II.  DISCUSSION

### A.  Statute of Limitations

California Code of Civil Procedure section 339 establishes a two year statute of limitations for "an action founded upon a contract, obligation or liability, evidenced by a certificate, or abstract or guaranty of title of real property, or by a policy of title insurance; provided, that the cause of action upon a contract, obligation or liability evidenced by a certificate, or abstract or guaranty of title of real property or policy of title insurance shall not be deemed to have accrued until the discovery of the loss or damage suffered by the aggrieved party thereunder."

In Tabachnick v. Ticor Title Ins. Co., 24 Cal. App. 4th 70 (1994), the California Court of Appeal attempted to clarify when a cause of action against a title insurer accrues. The court concluded that Tabachnick's cause of action against the title insurer "accrued when he discovered the protected tenancy status of his tenant . . . . He then had two years in which to commence his action . . . ." Id. at 77; see also Forman v. Chicago Title Ins. Co., 32 Cal. App. 4th 998, 1005 (1995) ("In Tabachnick, the insured independently learned of the error in the title insurance company's report. Instead of filing any kind of claim with the insurance company and without notifying the insurance company of its error, he filed a lawsuit against those who sold him the property. Three years later, for the first time, he filed a claim with the insurance company asking it to indemnify him for the costs of his lawsuit against these third parties." (emphasis in original)); Herbert A. Crocker & Co. v. Transamerica Title Ins. Co., 27 Cal. App. 4th 1722, 1728 (1994) ("[Section 339] specifies that the statutory period does not commence to run until the aggrieved party has discovered the 'loss or damage.' Thus, once the plaintiff discovers the loss or damage, he or she has two years in which to sue the issuer of the abstract of title.").

In 65 Butterfield v. Chicago Title Ins. Co., 70 Cal. App. 4th 1047, 1054 (1999), the insured argued:

> [B]ecause section 339(1) provides that a claim on a title policy accrues upon "discovery of the loss or damage suffered by the aggrieved party <u>thereunder</u>," there is no accrual until the insured becomes aware of facts showing the loss is covered <u>under the policy</u>. Thus, Butterfield asserts, accrual requires "discovery of facts that show that the adverse claim is of <u>title</u>, founded on <u>matters of record, other than those expressly excepted</u> in the title policy, . . ." Butterfield contends it did not have knowledge of such facts until May 1994, when the County identified the Omitted Documents as the basis of its claim to the slope easement. [Emphasis in original].

The <u>Butterfield</u> Court acknowledged that such a requirement would conflict with the general rule for the accrual of causes of action which holds that "'it is the discovery of facts, not their legal significance, that starts the statute.'" <u>Id.</u> (quoting <u>Jolly v. Eli Lilly & Co.</u>, 44 Cal. 3d 1103, 1113 (1988); <u>see also id.</u> ("'[i]t is irrelevant that the plaintiff is ignorant of his legal remedy or the legal theories underlying his cause of action.' Consistent with that principle, numerous decisions hold that an insured need not be aware a loss may be covered by the policy before the statute of limitations will begin to run." (quoting <u>Gutierrez v. Mofid</u>, 39 Cal. 3d 892, 898 (1985)).

Although the <u>Butterfield</u> Court concluded that it was "aware of no authority holding that title insurance claims are subject to the heightened discovery standard Butterfield advocates" it did state that <u>Tabachnick</u> could be read to "imply a requirement that the insured understand the extent of the policy's coverage before 'discovery' of a loss can occur." <u>Id.</u> at 1055. Because the plaintiff in <u>Butterfield</u> could not even meet its own heightened discovery standard, the court declined to resolve the accrual issue. <u>Id.</u> As <u>Butterfield</u> notes, however, <u>Tabachnick</u> need not be read to require a heightened discovery standard. The phrase relied upon by the plaintiff in <u>Butterfield</u> to support its heightened discovery standard states that the "'liability is one that does not accrue until discovery of the

-6-

1  loss <u>that may be incurred if the title is not as represented in the certificate</u>.'" Tabachnick, 24
2  Cal. App. 4th at 77 (emphasis added) (quoting Title Ins. & Trust Co. v. Los Angeles, 61 Cal.
3  App. 232, 236 (1923).

4         As did the plaintiff in Butterfield, Plaintiffs here argue that this language requires
5  knowledge not just of the existence of the Sewer Easement, but knowledge that the Sewer
6  Easement was not excepted in the Policy, for the statute of limitations period to begin
7  running. The very next sentence in Tabachnick, however, states: "The conclusion that the
8  cause of action on a certificate of guaranty accrues when the holder of the certificate
9  discovers the potential loss applies equally to a policy of title insurance, though a certificate
10 of guaranty and a title insurance policy differ in certain other respects." Id. This next
11 sentence drops the reference to the title not being "as represented in the certificate."
12 Moreover, the Court of Appeal in Tabachnick held that the statute of limitations began
13 running on the date Tabachnick instituted his suit against the protected tenant without ever
14 considering or stating that this was also the date on which Tabachnick was aware that the
15 title insurance policy failed to except the protected tenancy.

16        Plaintiffs have provided no policy rationale for a heightened discovery standard in
17 title insurance cases and the <u>dicta</u> in the cases arguably supporting their position appears to
18 be based either on a misreading of precedent or the peculiar facts of those cases. For
19 example, in Overholtzer v. Northern Counties Title Ins. Co., 116 Cal. App. 2d 113, 123
20 (1953), the California Court of Appeal stated that "[k]nowledge of the existence of the pipe
21 was not knowledge of the existence of the easement." In Overholtzer, however, the statute
22 of limitations was never an issue because the insured notified the insurer of the cloud on title
23 less than four months after the policy was issued. Id. at 117-18. Similarly, in J.H. Trisdale,
24 Inc. v. Shasta County Title Co., 146 Cal. App. 2d 831, 837, the insured brought suit against
25 the insurer six months after learning "of the existence of the right-of-way . . . ."
26        Without a meaningful justification for departing from California's general rule
27 concerning the accrual of causes of action and the commencement of the running of statutes
28 of limitation, the Court declines to impose a different rule for actions involving title

-7-

1 insurance policies. While the val maps may have provided Plaintiffs with constructive or
2 even actual notice of the Sewer Easement by some time in 1994, there is no doubt that
3 Plaintiffs knew of the Sewer Easement no later than June 5, 1997 when engineers from
4 ACTA and the City of Los Angeles discussed possible design alternatives for the relocation
5 of the sewer. By that date, Plaintiffs had already begun designing the specifications for the
6 sewer relocation and were discussing the likelihood that the relocation would be bid as part
7 of the construction of the Mid-Corridor Trench. Consistent with the language of California
8 Code of Civil Procedure section 339, the June 5, 1997 meeting establishes that the latest date
9 for "discovery of the loss or damage suffered by the aggrieved party" for accrual of
10 Plaintiffs' cause of action under the Policy. Because Plaintiffs failed to make a claim on the
11 Policy until January 2000 and failed to file suit until April 2001, their claim is barred by the
12 two year statute of limitations.

### B. Exclusion 3 for Records Not Shown by the Public Records

It is undisputed that the Policy excludes from coverage easements not shown by the "public records" which the Policy defines as "those records which by law impart constructive notice of matters relating to the land." Plaintiffs argue that the Sewer Easement is a matter of public record, and thus covered by the Policy, because both the Final Judgment creating the Sewer Easement and the Lis Pendens concerning the action by which the Sewer Easement was ultimately created were recorded. With respect to the Final Judgment, Stewart Title argues, by contrast, that the Final Judgment does not provide constructive notice because it was improperly indexed. Stewart Title argues that the Lis Pendens does not provide constructive notice because it ceased to have legal effect upon the entry of the Final Judgment.

#### 1. The Final Judgment

Plaintiffs argue that the Final Judgment reflecting the Sewer Easement was shown by the public records and therefore gave constructive notice to Stewart Title even though it was not properly indexed. Plaintiffs rely on California Government Code section 27326 which states:

> The recorder shall file a record of deeds, grants, and transfers, certified copies of final judgments or decrees partitioning or affecting the title or possession of real property. From the time of filing with the recorder for record, the certified copy of the judgment or decree imparts notice to all persons of its contents, and any subsequent purchaser, mortgagee, and lienholder purchases and takes with the same notice and effect as if the copy of the decree were a duly recorded deed, grant or transfer.

Plaintiffs argue that according to the plain language of section 27326, the only requirement for a final judgment to provide constructive notice is that it be recorded.

In response, Stewart Title points to cases where courts have found proper indexing to be a precondition of constructive notice. For example, in <u>Hochstein v. Romero</u>, 219 Cal. App. 3d 447 (1990), the California Court of Appeal held that an improperly indexed judgment creating a lien on a property did not provide constructive notice to the purchasers. The court explained that mere recordation of the judgment is not sufficient to impart constructive notice:

> [B]efore the constructive notice will be conclusively presumed, the document must be "recorded as prescribed by law." A document not indexed as required by statute, does not impart constructive notice because it has not been recorded "as prescribed by law." "The policy of the law [requiring recordation and indexing] is to afford facilities for intending purchasers . . . in examining the records for the purpose of ascertaining whether there are any claims against [the land], and for this purpose it has prescribed the mode in which the recorder shall keep the records of the several instruments, and an instrument must be recorded as herein directed in order that it may be recorded as prescribed by law. If [improperly indexed],

-9-

> it is to be regarded the same as if not recorded at all." (Cady v. Purser (1901) 131 Cal. 552, 558 [63 P. 844].) Thus, it is not sufficient merely to record the document. "California has an 'index system of recording,' and . . . correct indexing is essential to proper recordation." (4 Witkin, Summary of Cal. Law 407 (9th ed. 1987); see also 3 Miller & Starr, Current Law of Cal. Real Estate, Recording and Priorities, §§ 8:16-8:20, pp. 308-314 (2d ed. 1989).)
>
> * * *
>
> The California courts have consistently reasoned that the conclusive imputation of notice of recorded documents depends upon proper indexing because a subsequent purchaser should be charged only with notice of those documents which are locatable by a search of the proper indexes. Conversely, where the document is improperly indexed and hence not locatable by a proper search, mere recordation is insufficient to charge the subsequent purchaser with notice.

Id. at 452 (citations omitted but parenthetical information in the original). Similarly, in Lewis v. Superior Court, 30 Cal. App. 4th 1850 (1994), the court found that a lis pendens filed with the recorder before purchasers took title but not indexed until the next day did not give the purchasers constructive notice of an encumbrance on the title:

> It is a common misperception . . . that a recorded document imparts constructive notice from the moment it is recorded. That is not the law. The operative event is actually the indexing of the document . . . .

Id. at 1866. The Lewis court further stated that "[o]ver the years, the [California] courts have been absolutely consistent in following the indexing rule." Id. at 1867. Thus, under existing California authority, the improperly indexed Final Judgment creating the Sewer

-10-

Easement does not appear to provide constructive notice of the Sewer Easement's existence and would therefore be excluded from coverage under Exclusion 3.

Plaintiffs attempt to distinguish the cases cited by Stewart Title by arguing that those cases depended on the fact that due to the improper indexing the document "cannot be found," Lewis, 30 Cal. App. 4th 1866 or is "not locatable by a proper search." Hochstein, 219 Cal. App. 3d at 452. Plaintiffs argue that Stewart Title would have located the Final Judgment if it had performed a reasonable search. In support if their argument, Plaintiffs present evidence that Joseph Munsey, an expert in title search procedures, was able to find the Final Judgment and Lis Pendens by conducting the type of title plant search Stewart Title performed or should have performed according to its own procedures.[4]

In essence, Plaintiffs are attempting to expand the scope of the Policy's coverage based on Stewart Title's alleged negligence. In response, Stewart Title argues that unlike an abstractor of title, a title insurer is not liable for failing to perform a diligent search. Instead, a title insurer is only responsible for impediments which are covered under the terms of the policy because they appear in the public record:

> An abstractor of title is hired because of his professional skill, and when searching the public records on behalf of a client he must use the degree of care commensurate with that professional skill; unlike a title insurer who can define the extent of his liability under the policy, the abstractor must report all matters which could affect his client's interests and which are readily discoverable from those public records ordinarily examined when a reasonably diligent title search is made.

Contini v. Western Title Ins. Co., 40 Cal. App. 3d 536, 546-46 (1974). Stewart Title argues that if Plaintiffs had wanted the coverage they now seek, they could have paid for an abstract of title and its correspondingly greater coverage.

---

[4] Munsey was retained by Plaintiffs.

-11-

Stewart Title's alleged negligence is not relevant to the scope of coverage provided under the Policy. The extent to which Stewart Title could have or should have discovered the Final Judgment does not alter the Policy's definition of a "public record" or the manner in which that phrase is interpreted by California's courts. Because the Final Judgment was not properly indexed, it did not "by law impart constructive notice of matters relating to the land" and was therefore not a "public record" under California law. Plaintiffs have not established how any factual dispute concerning the scope of Stewart Title's duty to perform a reasonable search expands Stewart Title's contractual obligations beyond those contained in the Policy. Accordingly, the Final Judgment is excluded from coverage by Exclusion 3 of the Policy.

### 2. The Lis Pendens

Plaintiffs argue that even if the improperly indexed Final Judgment is not considered a public record as defined by the Policy, the properly indexed Lis Pendens still provided Stewart Title with constructive notice of the Sewer Easement. Stewart Title argues, however, that under existing law, a lis pendens has no legal effect except to give notice of a pending lawsuit, and that once the suit is concluded it becomes a nullity which is not capable of providing constructive notice. For example, in Garcia v. Pinhero, 22 Cal. App. 2d 194 (1937), the California Court of Appeal held that a lis pendens filed in a first action which was dismissed for failure to file an amended complaint did not serve as constructive notice of a second action based on virtually the same allegations as in the dismissed action:

> The lis pendens notice that may be properly recorded in an action which in some manner affects the title or right of possession to real property is purely incidental to the action wherein it is filed. It refers specifically to such action, and has no existence apart from it. Its sole object is to afford constructive notice that this particular action is pending. When, therefore, the action has been terminated by the entry of a judgment and by expiration of the statutory time within which an

>appeal for the judgment may be taken, the notice of lis pendens has fully served its purpose. The action of which it was an incident has come to an end. It is no longer pending.

Id. at 197. Similarly, the court in Contini observed that "[t]he purpose of a lis pendens is to give constructive notice of pending litigation affecting real property and this purpose is accomplished once the litigation terminates; arguably, only a recorded judgment, not a pre-existing lis pendens, imparts notice of the judgment's contents." Contini, 40 Cal. App. 3d at 542 (citations omitted). Thus, Stewart Title argues that once the Final Judgment creating the Sewer Easement was entered, the action about which the Lis Pendens provided notice was terminated and, as a matter of law, the Lis Pendens ceased to serve any purpose.

Plaintiffs argue that California courts have not decided the issue presented here where the lis pendens was properly recorded but the ensuing judgment was not. See 5 Miller & Starr, California Real Estate, § 11:137 (3d ed. 2000) ("It is not clear whether the lis pendens continues to impart notice after the action is final and the judgment is not recorded when an interest in the property is received after the judgment has become final. In one case [Garcia], the court found that the lis pendens did not give notice after a judgment dismissing the complaint on a general demurrer had become final. The [Contini] court confirmed the rule by dictum, left the issue open, and referenced a contrary rule in two other decisions, but the facts of those cases do not support a contrary rule.").

As they did with the Final Judgment, Plaintiffs attempt to use Stewart Title's alleged negligence in failing to find the Lis Pendens as justification for coverage under the Policy. To do so would expand Stewart Title's duties beyond those established by the Policy. Plaintiffs have provided no legal justification to expand a title insurer's duties based on its alleged negligence. The risk to a title insurer of negligently preparing a preliminary title report is that it faces an increased likelihood that it will be required to pay a covered claim. A negligently prepared preliminary title report should not turn a non-public record into a public one or turn an excluded claim into a covered claim. Nothing in the factual record presented by Plaintiffs in support of their motion supports a different result. Stewart Title's

relationship with Plaintiffs is a contractual relationship and should, in the first instance, be based on the terms of that contract. The Lis Pendens was extinguished by the Final Judgment even though the Final Judgment was improperly indexed. Exclusion 3 therefore operates to preclude coverage.

C. <u>Exclusion 9(a) for Defects Created by an Insured Claimant</u>

Exclusion 9(a) precludes coverage for "[d]efects, liens, encumbrances, adverse claims, or other matters (a) whether or not shown by the public records at Date of Policy, but created, caused, suffered, assumed or agreed to by the insured claimant . . . ." Stewart Title argues that because the City of Los Angeles initiated the suit which created the Sewer Easement, the City of Los Angeles' claim for damages is subject to Exclusion 9(a). While this argument has some merit, Stewart Title also admits that Exclusion 9(a) does not apply to the City of Long Beach's claim because it did not create the Sewer Easement. <u>See</u> Stewart Title's Motion for Summary Judgment, n.11 ("The Final Judgment was not created by plaintiff City of Long Beach and, thus, Stewart Title does not assert the § 9(a) exclusion against the City of Long Beach."). Because Exclusion 9(a) does not dispose of each of the Plaintiffs' claims, the Court declines to consider it.

D. <u>Exclusion 9(c) for Defects Resulting in No Loss or Damage to the Insured Claimant</u>

Exclusion 9(c) precludes claims "resulting in no loss or damage to the insured claimant . . . ." The Policy defines "insured claimant" as "an insured claiming loss or damage hereunder." "Insured," in turn, is defined as:

> [T]he insured named in Schedule A, and, subject to any rights or defenses the Company may have had against the named insured, those who succeed to the interest of such insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

-14-

The Policy lists the named insured as "City of Los Angeles, a municipal corporation, acting by and through its Board of Harbor Commissioners and City of Long Beach, a municipal corporation, acting by and through its Board of Harbor Commissioners."

Plaintiffs alternatively argue that either ACTA is an insured because it succeeded to the interests of the named insureds or the cities have suffered damage, and therefore have a valid claim, even though ACTA paid for the sewer relocation. The parties have submitted no California case law construing the succession language contained in the Policy. In Hawkins v. Oakland Title Ins. & Guar. Co., 165 Cal. App. 2d 116 (1958), the succession language included within its definition of insured "any such owner or successor in ownership of any such indebtedness who acquires the land described . . . by lawful means in satisfaction of said indebtedness or any part thereof, and any person or corporation deriving an estate or interest in said land, as an heir or devisee of a named insured, or by reason of the dissolution, merger, or consolidation of a corporate named insured . . . ." Id. at 121. The California Court of Appeal concluded that the corporate successor in Hawkins, which obtained the property at issue in exchange for shares in the company, was not an insured. Id. at 127-28. Here, ACTA has not "succeeded" to the interests of either city, but instead possesses rights to construct and operate the Alameda Corridor pursuant to a use permit granted to it by the cities. Accordingly, it is not an insured "by operation of law" like the examples of heirs, devisees, and corporate successors listed in the Policy and is therefore not an insured claimant. As a result, ACTA cannot claim reimbursement for the sewer relocation expenses it incurred.

Plaintiffs argue that even if ACTA is not entitled to benefits, the cities are entitled to benefits because ACTA, as a joint powers authority between the two cities, is akin to a partnership, and the partnership's members were damaged by the increased costs of the sewer relocation borne by the partnership. In support of their argument, Plaintiffs rely on Hawkins and Mississippi Valley Title Ins. Co. v. Malkove, 540 So. 2d 674 (Ala. 1988) ("Malkove"), in which the original owners of property, who were named insureds, transferred their interests to partnerships of which they were members. In both instances,

-15-

1 the original owners were entitled to damages from the title insurer for the decreased value of
2 the property. See Hawkins, 165 Cal. App. 2d at 123; Malkove, 540 So. 2d at 678. Here,
3 however, there is no evidence that the cities suffered damages resulting from the diminution
4 in value of the Right of Way. Instead, the manner in which the cities created ACTA as a
5 joint powers authority shielded them from financial harm. The undisputed facts establish
6 that the cities were reimbursed $107 million for preliminary engineering work out of
7 revenue bonds which are the sole obligation of ACTA. See Plaintiffs' Statement of Genuine
8 Issues, ¶¶ 61 & 63. The cities' only other contribution to the $2.4 billion Alameda Corridor
9 was $394 million in land acquisition costs. Id. at ¶ 62. The cities therefore cannot show that
10 they suffered any loss or damage resulting from the Sewer Easement. Because the cities
11 have not been damaged and ACTA is not an insured claimant, Exclusion 9(c) operates to
12 preclude Plaintiffs' claim.

E. The Special Endorsement

The parties both argue that the plain meaning of the Special Endorsement is clear and supports their respective, and mutually inconsistent, positions. The Special Endorsement provides that Stewart Title:

> [H]ereby insures the Insured that the easement estates or easement interests as shown in Schedule A of this policy include the right to construct, install, erect, reconstruct, locate, maintain, use and operate rail and rail-related appurtenances on and under the surface (without limitation as to depth) of the easement estates or easement interest described in Schedule A.

Two other paragraphs of the Special Endorsement, which the parties do not address, provide that:

> The company hereby insures said insured against loss or damage which said insured shall sustain as a result of any claim, action or proceeding contesting or attempting to limit said right (including, without limitation, costs, attorney's fees and

-16-

>expenses incurred in defending, contesting or settling any such claim, action or proceeding), or in the event that the assurance herein shall prove to be incorrect.
>
>* * *
>
>The total liability of the company under said policy and any endorsements therein shall not exceed, in the aggregate, the face amount of said policy and costs which the company is obligated under the conditions and stipulations thereof to pay.

Plaintiffs' claim for coverage under the Special Endorsement is only viable if the endorsement is not subject to Stewart Title's statute of limitations defense and the policy defenses provided by Exclusions 3 and 9(c). Even then, Plaintiffs could only obtain coverage if their claim falls within the scope of coverage provided by the Special Endorsement.

The Court's determination that Plaintiffs' claim is barred by the two year statute of limitations makes it unnecessary to consider the applicability of the Policy's exclusions to the Special Endorsement. Nevertheless, to the extent they preclude the Plaintiffs' claim, the Policy's exclusions also apply to the coverage provided by the Special Endorsement. To the extent possible, the terms of an insurance policy and any endorsements attached to the policy will be read consistently. Only where a conflict exists will the terms of an endorsement control over the terms of the policy. Continental Cas. Co. v. Phoenix Constr. Co., 46 Cal. 2d 423, 431 (1956) ("[I]f there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls."). Here, the Special Endorsement is not inconsistent with either Exclusion 3 or Exclusion 9(c). Moreover, the third paragraph of the Special Endorsement specifically incorporates the Policy's conditions and stipulations: "The total liability of the company under said policy and any endorsements therein shall not exceed, in the aggregate, the face amount of said policy and costs which the company is obligated under the conditions and stipulations thereof to pay." Because Exclusions 3 and

-17-

9(c) are not in conflict with the Special Endorsement, and are in fact incorporated, the Court finds that Exclusions 3 and 9(c) preclude coverage under the Special Endorsement.

     Even if coverage were not barred by Exclusions 3 and 9(c) or the statute of limitations, the Special Endorsement does not provide coverage for Plaintiffs' claim because the existence of the Sewer Easement did not interfere with Plaintiffs' "right to construct, install, erect, reconstruct, locate, maintain, use and operate rail and rail-related appurtenances on and under the surface (without limitation as to depth) . . . ." Because the Sewer Easement ran in favor of the City of Los Angeles, Plaintiffs were not required to obtain rights in addition to those purchased from Southern Pacific. No neighboring landowner has attempted to limit Plaintiffs' right to construct the Mid-Corridor Trench. Although the Sewer Easement made construction of the Mid-Corridor Trench more expensive, it did not interfere with Plaintiffs' "right to construct" the trench. Therefore, according to the plain language of the Special Endorsement, there is no coverage for Plaintiffs' claim.

     Though it is not necessary to consider the drafting history of the Special Endorsement to construe its meaning, even a cursory review of that history supports the conclusion that there is no coverage. Plaintiffs and Stewart Title negotiated the language of the Special Endorsement to assuage Plaintiffs' concerns that the Right of Way did not include the right to construct a below-surface trench. These concerns were based on the fact that the easement rights Plaintiffs were obtaining from Southern Pacific were for a surface railroad. It was this concern which prompted the inclusion of the Special Endorsement in the Policy. The Special Endorsement's reference to the "right" to construct the rail line "without limitation as to depth," is clear and consistent with the drafting history. The Court's interpretation of the Special Endorsement is consistent with both the plain language of the Policy and a drafting history which involved sophisticated parties on both sides. The increased costs associated with the sewer relocation do not fall within the plain language of the Special Endorsement.

-18-

### III. **CONCLUSION**

For the foregoing reasons, Stewart Title's Motion for Summary Judgment is granted with respect to the statute of limitations and Exclusions 3 and 9(c). The Court declines to address Exclusion 9(a). The Court also grants Stewart Title's Motion for Summary Judgment on the Special Endorsement. Plaintiffs' Motions for Summary Judgment and for Summary Judgment on the Special Endorsement are denied. Stewart Title shall lodge and serve a proposed judgment by April 15, 2003. Objections, if any, to the form of proposed judgment shall be lodged and served on or before April 22, 2003.

IT IS SO ORDERED.

DATED: April 7, 2003

                                              Percy Anderson
                                   UNITED STATES DISTRICT JUDGE